## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

_____

| | |
|---|---|
| **Dr. James K. Newman,** | ) |
| **PO Box 1653** | ) |
| **Corazol, Puerto Rico, 00783** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **JURY TRIAL DEMANDED** |
| **Brooke Rollins,** | ) |
| **Secretary,** | ) |
| **United States Department of** | ) |
| **Agriculture,** | ) |
| **1400 Independence Ave., S.W.,** | ) |
| **Washington, DC 20250** | ) |
| . | ) |
| **Defendant.** | ) |

_____ )

### COMPLAINT
(Discrimination and Retaliation)

### I.   INTRODUCTION/ PRELIMINARY STATEMENT

Dr. James K. Newman ("Newman" or "Plaintiff") hereby files this

Complaint against the Secretary of the Department of Agriculture, for the acts of

the component Natural Resources Conservation Service ("NRCS"), alleging

national origin(non-Puerto Rican), age (then 58) and sex (male) discrimination in

2019, in failing to select him for a position as Puerto Rico State Engineer in the

Natural Resources Conservation Service ("NRCS").

### II.   PARTIES

1.     Newman is originally from Pennsylvania, has long resided in

Puerto Rico, and was a licensed engineer at the relevant time.

2.      The United States Department of Agriculture ("Defendant"), is an Agency of the United States of America.

3.      Defendant Brooke Rollins is the Secretary of the Department of Agriculture and is sued in her official capacity only.

### III.    JURISDICTION AND VENUE

4.      The Court has jurisdiction of this matter pursuant to 42 U.S.C. § 2000 et. seq and 28 U.S.C. 1331, 1343(a). Venue is proper in the District of Puerto Rico, because this case arises out of discrimination and reprisal committed by Defendant with respect to Plaintiff's applications for employment in this District.

### IV.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Newman protested his treatment through EEO counselor contacts.

6.      Newman timely filed formal charges of discrimination with the Department's EEO office and has at all times been actively pursuing his claims for the 7 years since.

7.      On or about August 19, 2022, an Administrative Judge ("AJ") with the Equal Employment Opportunity Commission's Miami Office issued a final decision on Newman's claim.

8.      On or about 10-27-2022, Newman filed a timely appeal of that decision, with the Equal Employment Opportunity Commission's Office of Federal Operations.

9.      The Office of Federal Operations issued a decision on September 15, 2025, affirming the decision favoring the Agency.

10.    Because less than 90 days have passed since that decision, Newman is free to file his lawsuit on the issues raised in his administrative claims. 29 CFR § 1614.407(d).

11.    Therefore, as to all matters alleged herein, Newman is free to exercise his private right of action in the U.S. District Court and to obtain a trial de novo pursuant to 42 U.S.C. 2000e-16(c).

## V.    FACTS PERTAINING TO THE UNLAWFUL NON-SELECTION OF NEWMAN UNDER POSITION VACANCY No. NRCS-19-10492203-DE-MM

12.    Newman alleges he was discriminated against on account of his national origin (non-Puerto Rican), age (then 58) and sex in 2019, when he was denied competitive selection to the position of Puerto Rico State Engineer in the Natural Resources Conservation Service ("NRCS") GS-0810-13 under Announcement No. NRCS-19-10492203-DE-MM.

13.    Based on his application, Newman's candidacy under the Vacancy Announcement reached the selecting official Juan Hernandez—the Acting State Conservationist in Puerto Rico-- and he was indisputedly qualified—as recognized by his presence on the certificate.

14.    However, he was denied selection in favor Yilia Baucage, a much younger (age 41 or 42) Puerto Rican woman who lacked the basic qualifications for the position and whose training, education and experience compared most unfavorably against those of Newman.

## VI.    FACTUAL BACKGROUND

### A. Duties of the State Conservationist and State Engineer; Priorities for the State Engineer; Conservation Engineering

15.    It is undisputed that in NRCS, the State Conservationist (formerly Edwin Almodovar, then Juan Hernandez) supervises the State Engineer, but need not personally be an engineer.

16.    Juan Hernandez (hereinafter, "Hernadez") the Acting State Conservationist in 2019, was the sole decision maker for the position in question.

17.    According (Juan Deposition at 13-14) to Hernandez, Conservation Engineering is:

> the implementation of engineering practices. I mean, all practices from NRCS they are categorized into two components, either they are engineering practices or they are ecological science practices, meaning the ecological is more staffed non gray practices like cover crops and tree planting and things like that. So then we have the engineering practices that are the more structural in nature - irrigation, conveyances, things like that. So that's what we get involved constantly with with (sic) both of these practices type.

18.    Carlos Suarez, hereinafter, "Suarez", is a State Conservationist from California whom Hernandez asked to "rank" the candidates.

19.    In this matter,Suarez has under oath described the work of Conservation Engineers as follows:

> The field engineers? It varies from installing waterways or design waterways, animal waste systems, also stream bank restoration by engineering work. Also they can perform checkouts on installation of different engineering practices. So it varies depending on the State. Irrigation systems as well. So on and so forth. That's at the field level.

20.     James Tillman, hereinafter "Tillman ", the Southeast Regional Conservationist, explained under oath that highway engineering is not an activity of NRCS engineers.

21.     As of 2022, Tillman served as second-line supervisor for several State Engineers, including the Caribbean (Puerto Rico/Hernandez).

22.     Tillman has explained that the only State Engineer services required by the Agency that Tillman can remember are for watershed design and manure management.

23.     It is undisputed that the State Conservationist in part defines the priorities for the State Engineer.

24.     Former State Engineer Damaris Medina (hereinafter, "Medina") was familiar with NRCS programs and priorities.

25.     Medina's NRCS program experience aided her in developing and implementing priorities for NRCS Puerto Rico.

26.     Edwin Almodovar Almodovar (hereinafter "Almovodar"), who was the State Conservationist and supervised the State Engineer position, has stated that Medina's key State Engineer priorities were the Emergency Watershed Protection workload and all recovery efforts after the 2017 storms.

27.     All engineers, including the State Engineer, were engaged in design, implementation and inspection of all related disaster program workloads to include the Emergency Watershed Protection, and the Environmental Quality Invention Program-- EQIP.

28.     At the relevant time, the State Engineer supervises approximately five people.

29.     Hernandez provided input into the drafting of Vacancy Announcement No. NRCS-19-10492203-DE-MM.

30.     That Vacancy Announcement states applicants will not be considered if they cannot satisfy "Minimum Qualifications Requirement" of "at least one year of specialized experience. . . defined as: **providing technical leadership and training to staff in the design and construction of engineering programs for the development and implementation of natural resource conservation plans.**"

31.     Hernandez admits the document is accurate in that the incumbent advises on natural resources conservation programs, and that it also provides technical leadership and training in design and construction of engineering programs for the development and implementation of natural resource conservation plans.

32.     Tillman has stated that the Annual Report accurately states "NRCS [] provide[s] technical and financial assistance through the EWP to repair watershed damage from ][ Irma and Maria."

**B.  Background on Immediate Predecessor-- Puerto Rico State Conservationist—Almodovar**

33.     Almodovar was State Conservationist in Puerto Rico for approximately ten years.

34.    He was reassigned in 2019, after he sent the SF-52 requisitioning a State Engineer that resulted in the selection of Baucage over Newman.

35.    Silmarie Padron (hereinafter "Padron") has stated Almodovar was the most knowledgeable leader regarding NRCS Puerto Rico engineering projects' requirements at the beginning of 2019 because he was working closely with the State Engineer.

36.    Suarez has stated that Almodovar is generally truthful.

**C.  Intersection of "Conservationist" and "Engineer" Work**

37.    Experience working as a District Conservationist-- such as Newman's-- was highly valuable experience for the State Engineer position.

**D.  Newman's Resume and Candidacy; It is Undisputed Newman was Qualified for the Position; Hernandez Knew Newman's Identity**

38.    Hernandez discussed Newman with his NRCS reference Jose Castro before selecting Baucage, knowing Newman was male and believing he was retired and over 55 years old.

39.    Hernandez) thought "Newman" would be an unusual name for a Puerto Rican, "without a doubt."

40.    So Hernandez knew Newman's identities on those protected characteristics at the time of the selection.

**E.  Newman's Experience: District Conservationist, NRCS, Corozal, Puerto Rico**

41.    It is undisputed Newman was qualified for State Engineer, as his name was advanced to selecting official Hernandez on the selection certificate.

42.     It is undisputed Newman's resume demonstrates he is a licensed engineer in Puerto Rico and—unlike the selectee-- possesses an engineering Ph.D.

43.     It is undisputed Newman performed engineering work as District Conservationist for NRCS in Corozal, Puerto Rico, from 1995-2005.

44.     Most centrally, Newman implemented the Emergency Watershed Program in the wake of hurricane disasters.

45.     Newman worked with several engineers, including those in the state office.

46.     It is undisputed that at NRCS in Corazal, Newman provided technical assistance to farmers for waste management of large poultry enterprises and swine operations where contamination risk from the waste was great, and provided Puerto Rico's central mountain region agricultural community with technical designs for erosion control, water resources protection and overall natural resources management.

47.     It is undisputed that at NRCS in Corazal, Newman worked on water management systems and erosion control, designing hillside ditches so the wastewater could drain in an environmentally secure manner.

48.     Having earned his professional engineering (PE) license in 1996, Newman's Engineering Job Approval Authority with NRCS reflected his qualifications as a registered PE in Puerto Rico.

49.     It is undisputed that at NRCS in Corazal, Newman inventoried, evaluated, and recommended approval of Emergency Watershed Protection Program (EWP) funding for streambank restoration and protection projects as an NRCS field engineer with a PE.

50.     Hernandez  admitted Newman was qualified for State Engineer, and Padron admitted Newman's civil engineering experience in "ranking" him among her top three for selection.

51.     It is undisputed that during his 10 years with NRCS in Corozal, Newman's NRCS Engineering Job Approval Authority permitted him to provide staff leadership in all phases of the engineering programs of NRCS including formulation of standards, specifications, engineering planning, design, and construction in northcentral Puerto Rico.

52.     Hernandez has admitted never investigating what Newman's job approval authority actually was.

**F.  Newman's Experience: Soil Conservation/Irrigation Engineer, St. Kitts**

53.     It is a logical progression with synergy for an Engineer to work as a District Conservationist and then a State Engineer.

54.     Newman's resume shows strong supervisory background, particularly with regard to St. Kitts..

55.     Newman's resume shows that at St. Kitts while a Peace Corps volunteer, he served as a Soil Conservation/Irrigation Engineer with the National Agricultural Corporation from 1984-1986.

56.    Newman's resume shows that at St. Kitts in  his capacity as an engineer, Newman designed (and supervised) construction of gabion basket drop structures.

57.    Newman's resume shows that at St. Kitts he was also responsible for designing (and supervising) the operation and maintenance of the big gun irrigation system for sugar cane and sprinkler irrigation systems for vegetable production.

58.    It is undisputed that Newman was appointed soil conservation engineer and irrigation engineer for the St. Kitts National Agricultural Corporation (NACO), and was responsible for site assessments, setting priorities, designing streambank stabilization and access road flood protection structures, training crew on best practices for lashing gabion cages, filling with stone, stacking and securing.

59.    Newman's resume shows that at St. Kitts, Newman rehabilitated road/stream crossings for controlled flood water conveyance, protecting access to sugarcane plantations and rural communities. Gabion basket drop structure designs installed at priority sites ensured access to the sugar cane harvest as the annual threat of tropical storms and hurricanes constantly loomed.

60.    It is undisputedNewman's expertise in the design and construction of gabion basket flood protection projects gained in St. Kitts prepared him for challenges ahead with the USDA NRCS EWP programs implemented in Corozal

after Hurricane Hugo in St. Croix, Georges and Hortense, as well as Irma and Maria which devastated Puerto Rico.

**G. Newman's Experience: District Conservationist, St. Croix, U.S.V.I.**

61.     It is undisputed that as the District Conservationist/Resource Conservation and Development Coordinator for the Virgin Islands, located in St. Croix, and as an engineer, Dr. Newman supervised NRCS projects as part of the Emergency Watershed Project in the aftermath of Hugo (an engineering project).

62.     It is undisputed that for NRCS in St. Croix, Newman's engineering knowledge and expertise allowed him to develop projects through the EWP, and work with a team of engineers and others.

63.     It is undisputed that Newman, for NRCS in St. Croix, documented damage survey reports (DSRs), identified and evaluated debris clearing and gabion project sites, coordinated with Virgin Islands government and private landowners, assisted SCS engineers with project designs, supervised and supported project inspectors, and worked with contract specialists and contractors to ensure contract integrity.

64.     It is undisputed that for NRCS in St Croix in 1987, Newman installed and monitored irrigation of tomatoes and performed accurate calibrations of the fertilizer and irrigation systems which required an engineer's skills and knowledge.

### H. Newman's Experience: District Conservationist, Ponce

65.     It is undisputed that in Ponce, Puerto Rico, as District Conservationist with the Soil Conservation Service/NRCS, Newman (James K. Newman Deposition at 16, 39) performed engineering duties by developing a waste management system to protect water quality in the heavy  producing activities of coffee processing and raising of hogs.

### I. Newman's Experience: Engineering Research, Ames, Iowa

66.     As a graduate student and research assistant at Iowa State University in Ames, Iowa, Newman worked on a project to evaluate the effect of well construction on water quality, including the potential contamination from pesticides, nitrogen, and bacteria in approximately 80 wells throughout Iowa. He visited each site, and documented the specific details of each well, such as its depth, diameter, type of construction, whether they were grouted or not, and surrounding area conditions.

67.     This research was pure engineering research.

### J. Newman's Experience:  Agricultural Advisor, USDA Foreign Agricultural Service, Herat, Afghanistan

68.     Newman's resume shows that under the title Agricultural Advisor for the USDA Foreign Agricultural Service in Herat, Afghanistan, Newman's engineering duties involved evaluating water systems for agricultural and urban supply uses – such as irrigation canals and hoop houses—and providing design improvements and technical assistance to the US miliary regarding civilian improvement projects in agriculture.

### K. Newman's Experience: Civil Engineer, NRCS - ACES, Puerto Rico

69.     It is undisputed that after the disasters of Hurricane Irma and Maria in FY 2018, Newman was recruited by NRCS to share his knowledge of NRCS programs and conservation engineering through the ACES program as civil engineer.

70.     It is undisputed that, contracted for FY 2019, Newman served as site inspector for EWP exigency projects in Jayuya, Naranjito, Bayamon.

71.     It is undisputed that the EWP program was the number one priority for NRCS at this time when the State Conservation Engineer was soon to retire.

72.     Accordingly, it is undisputed that Newman designed irrigation and drainage systems, which involved redesigning roads and other projects to achieve the end objective. He also used his technical engineering knowledge and experience to advise and give feedback to engineers on their designs.

### L. Newman's Experience: Coordinating Watershed Recovery After a Hurricane

73.     "[C]oordinating Watershed protection recovery effort following a hurricane," described in Newman's resume, was precisely what the Agency was looking for after 2017.

74.     Almodovar states Newman as a candidate "would have the edge" in understanding NRCS operations from experience with emergency watershed protection.

75.     Almodovar asserts Newman "would have the edge" on other candidates because he had  knowledge, was already an NRCS Caribbean area employee, was an engineer, and was exposed to the Agency in the area.

76.     Almodovar so stated in his Report of Investigation affidavit, even without knowing at the time that Newman was a Ph.D and had academic experiences that only enhance his qualifications.

**M. Newman's Supervisory and Project Manager Experience**

77.     Newman's resume shows he was a supervisor and knew how to manage people.

78.     According to Almodovar, Newman would have the edge in the selection process based on Almodovar's ten years' experience supervising the position in Puerto Rico, because he found that Newman had "unusually exceptional qualifications to become the State Engineer."

79.     In the Virgin Islands, on the Emergency Watershed Project, Newman (James K. Newman Deposition at 37-39) worked with and oversaw more than five (5) and fewer than ten (10) engineers.

80.     It is undisputed that Newman directed all field office operations as the Soil Conservation Service/NRCS District Conservationist in Ponce, Puerto Rico.

81.     It is undisputed that in Ponce, Newman supervised a soil conservationist and worked closely with an engineering technician and the State Conservation Engineer to implement a waste management system to protect

water quality in heavy waste producing activities: coffee processing and hog raising.

82.    It is undisputed that as District Conservationist in Corozal, Puerto Rico, Newman supervised the technicians working on construction and implementation of the waste management systems and implementing the Emergency Watershed Project in the wake of hurricane disasters.

83.    It is undisputed that as District Conservationist in Corozal, Newman had ultimate responsibility for what conservation practices were implemented, and could adjust, change, veto designs presented by the engineer.

Newman's Project Management Experience

84.    Edwin Almodovar Deposition has confirmed that the Newman resume also shows Project Management experience.

85.    Indeed, at the USDA, Newman worked with the State Conservation Engineer, and contracted engineering technicians, including a surveying expert.

86.    As the District Conservationist and Resource Conservation and Development Coordinator in the Virgin Islands, Newman coordinated the conservation districts within the VI–- St. Croix, St. Thomas and St. John–- on large scale projects that affected all districts.

87.    In the Virgin Islands, Newman  managed and supervised the Emergency Watershed Project, a large-scale engineering effort to address the effects of Hurricane Hugo.

88.     In Ponce, Puerto Rico, as the District Conservationist with the Soil Conservation Service/NRCS, Newman developed a waste management system to protect water quality in the heavy waste producing activities of coffee processing and raising of hogs.

89.     As District Conservationist in Corozal, Puerto Rico, Newman participated in several management projects, utilizing water management and waste run off techniques to protect water supply purity from the poultry and the hog industries, and helping implement the Emergency Watershed Project in response to hurricane disasters.

90.     In this assignment, Newman coordinated all field operations in the Cibuco and Torrecillas conservation districts.

91.     Newman also had a 3-month assignment as a U.S. Embassy Science Fellow at the U.S. Embassy in Mozambique tasked with preparing recommendations for possible funding of future water sector projects. He worked closely with agencies in Mozambique, such as the Ministry of Energy and Water, and the USAID, and NGOs, as well as the World Bank. Newman interviewed experts in the country, visited sites, sought input from local and agency engineers, and developed recommendations.

92.     In his time as a Program Specialist in the Caribbean Area state office, Newman performed management and administrative duties, in particular resolving payment issues between the national level and the field office as problems arose with the Protracts payment system.

93.    Newman's resume shows that at the Iowa Water Center, funded through the US Geological Survey for water resources research, Newman coordinated the funding programs

94.    It further shows that at the Iowa Water Center, Newman was responsible for issuing proposal requests and  overseeing the committee of experts that reviewed the proposals and selected the recipients of the funding.

### N. Newman's Research Experience

95.    Vacancy Announcement No. NRCS-19-10492203-DE-MM rendered research experience critical for selection. It is undisputed that the selectee for the position in lieu of Newman, Baucage had no research experience at all.

96.    Almodovar explained that as the Position Description states, it is of value for the State Engineer to be well-positioned to recommend research and collaborate with universities and other research agencies.

97.    Newman possessed that background, as demonstrated by his peer-reviewed writings.

98.    As an irrigation research assistant in St. Croix in 1987, Newman performed drip irrigation research on tomatoes. He calibrated the fertilizer input at different levels so they could collect production data on different levels of application amounts and irrigation and fertilizer amounts.

99.    Newman performed data collection as an engineer, who could perform engineering calibrations of the water systems.

100.    As a graduate student and research assistant at Iowa State University in Ames, Iowa Newman (James K. Newman Deposition at 40) worked on a project to evaluate the effect of well construction on water quality, including the potential contamination from pesticides, nitrate, and bacteria in approximately eighty (80) wells throughout Iowa. He visited the sites, and documented details of each well, such as its depth, diameter, type of construction, whether they were grouted or not, and conditions in the surrounding area.

101.    Newman  utilized his  engineering knowledge in this research. His resume states that as a Research Assistant while a PhD student at Iowa State University from 2006-2010, he developed a research plan that addressed needs in conservation engineering and acquired funding for it. His goal was to address the challenge of creating energy from crop residue in the Iowan fields, without destroying the soil. Through modeling, he studied the impact of different cropping scenarios on the soil in Iowa.

102.    Newman's resume shows he completed the project and was honored by having the article published in a peer-reviewed journal.

103.    Newman's resume shows he was a Post-doc Research Scientist, Department of Agricultural and Biosystems Engineering, Iowa State University from 1/13 to 6/14, and that he adapted his Ph.D research on the effects and impacts of corn stover removal on soil erosion to predict the impact on soil

organic carbon because of the removal of the residue for energy use, at a time when crop residue was harvested for ethanol production.

### O.  Hernandez Dishonestly Misstates Newman's Experience

104.    Hernandez testified to his purported view that Newman lacks a civil engineer's "practical skills" (though Newman disagrees).

105.    Hernndez testified to his purported view that Newman was not capable of "grabbing a survey" (though Newman disagrees).

106.    Hernandez testified to his purported view that Newman has no engineering experience (though Newman disagrees).

107.    Hernandez testified to his purported view that Newman's only engineering experience is as an ACES (though Newman disagrees).

108.    Hernandez admits Baucage has no experience with the Emergency Watershed Project.

### P.  State Conservationist Hernandez, the Sole Decisionmaker, who was Determined to "Give Opportunities to our own Folks" and was "Targeting" Younger Women

109.    Acting State Conservationist Hernandez  explained that the Baucage decision was made by him alone.

110.    Hernandez sought the issuance of the vacancy announcement, participated in crafting it, chose the "panelists", and chose not to interview Newman but clandestinely interview Baucage although both were candidates for selection on the certificate.

111.    However, "Panelist" Padron admits there was no "panel" because that implies interviewing the candidates.

112.    Padron explains the interview panel minimum required at least three members, including the lead, who is a recommender and that. "they" put together the interview process questions. Further, according to the mandatory procedure, all interviewees are to be asked the same questions.

113.    Padron specifically disavows any formal role in the Baucage selection.

114.    Padron several times tried to persuade Hernandez to follow the SOP and conduct panel interviews but Hernandez would not.

115.    Padron stated that Hernandez gave no rationale for not following the SOP and conducting panel interviews.

116.    Padron says her input was informal at her own request, because Hernandez was eschewing interviews, and Hernandez never indicated he would consider her input at all.

117.    Padron states she volunteered her input to Hernandez because of the SOP and despite not being a subject matter expert.

118.    Padron says that had she been formally in the process, she would have kept her notes, but did not do so under the circumstances.[1]

---

[1] See EEOC regulations at 29 C.F.R. 1602.14, which require Defendant to preserve all selection process documents for a 1-year period, and indefinitely, until the case concludes, if a charge or suit is filed. The class of documents that must be preserved is broad:

   **Where a charge of discrimination has been filed**, or an action brought by the Commission or the Attorney General, against an employer under title

119.    Padron states Hernandez conducted interviews for his other vacant position, State Resource Conservationist.

120.    Though she reviewed the resumes and recommended Baucage, Padron does not remember any deficiencies of Newman that would have made Baucage a better candidate than him.

121.    Like "Panelist" Padron, "Panelist" Suarez suggested that interviews be conducted, but Hernandez decided against it.

122.    Hernandez admits personally approved the vacancy announcement No. NRCS-19-10492203-DE-MM and read Ms. Baucage's resume before selecting her.

123.    Hernandez claims he relied only on the candidates' resumes to make the selection decision.

124.    Hernandez had throughout his career implemented engineering conservation practices and has supervised engineers.

125.    Indeed, he claims to be fully capable of supervising the work of the state conservation engineer.

---

VII or the ADA, the respondent employer shall preserve all personnel records relevant to the charge or action until final disposition of the charge or the action. **The term "personnel records relevant to the charge,"** for example, would include personnel or employment **records relating to the aggrieved person** and to **all other employees holding positions similar** to that held or **sought** by the aggrieved person and **application forms** or test papers **completed by an unsuccessful applicant and by all other candidates for the same position as that for which the aggrieved person applied and was rejected**.

Emphasis added.

126.    Hernandez had a history of "targeting" younger Hispanic females for selection. Edwin Almodovar Deposition at 79-80, 86.

127.    Hernandez's Puerto Rico State Conservationist predecessor, Almodovar testifies persuasively that Hernandez favored younger women candidates over men, and sought to "**give opportunities to our own folks[,]**" **referencing Puerto Ricans.**

128.    Almodovar, was concerned it might appear Hernandez was making his selections based on sexual interest in these candidates, rather than on their qualifications.

**Q. Selectee Baucage's Lack of Qualification**

129.    Selectee Baucage admits having had no experience in conservation engineering projects or plans.

130.    Almodovar agrees Baucage's resume shows no conservation engineering experience; no experience managing an emergency watershed program in the aftermath of a hurricane; and no academic writings.

131.    Baucage's background was entirely in transportation—not conservation—engineering.

132.    Almodovar stated that a candidate who had no experience in development and implementation of natural resource conservation plans would not meet the specialized experience requirement.

133.    Baucage lied on her assessment in order for Human Resources graded her as qualified.

134.    Hernandez then willfully ignored Baucage's resume text that showed she obviously could not meet the specialized experience requirement.

135.    Hernandez willfully set aside the always-followed process mandated in the SOP, including the interview, to assure no one would notice Baucage was not qualified.

136.    Suarez and Tillman both state Baucage must be qualified because Human Resources said she was.

137.    Almodovar indicated that a candidate who lied about their specialized experience on assessment should be immediately rejected from the process—*something that would occur during the interview* if it had not already occurred.

138.    Even the sole selecting official Hernandez admits knowing selectee **Baucage did not meet the mandatory Specialized Experience requirement**, while admitting Newman possessed it.

139.     Hernandez received a "ranking" from Padron, who reviewed the resumes despite not being a subject matter expert.

140.    Padron stated she *forgets* if Baucage met the requirement.

141.    Suarez, who also provided Hernandez with alleged candidate feedback, was unable to credit Baucage with the requisite specialized experience.

142.    Tillman was Regional Conservationist for the entire Southeast United States, second line supervisor of the Puerto Rico State Engineer and Approving Official for the vacancy.

143.    When asked about Baucage's conformity with the specialized experience requirement, Tillman, second-line supervisor of the State Engineer, answered that he could not answer that.

144.    Tillman recognized that he could not conclude from her resume that Baucage met the minimum qualifications.

**145.**    Tillman says he cannot state that Baucage's Assessment Question responses are all adequate.

**146.**    Tillman states he cannot state from Baucage's resume if she "routinely led" others.

147.    Tillman had not previously selected any engineers based on transportation engineering training.

148.    Tillman admits that unlike Hernandez, in all his times in the selection process, he would empower an *interview panel* to advise him when selecting a state engineer.

149.    Tillman admits qualifications of a state engineer include *watershed design*.

150.    Tillman states that background as district conservationist is beneficial for a state engineer.

151.    Tillman states NRCS engineers do not develop airports, or transit or traffic impact analysis, and also fails to claim they work on highway design, parking design or parking strategies—Baucage's background.

152.    Tillman admits the Agency encourages all selecting officials to use interviews, including by educating them through HR, so he *always* conducts them.

153.    Tillman says he believes interviews *were* used for Puerto Rico state engineer, though they were not.

154.    Hernandez states there is nothing in Baucage's resume "from which [he] could infer that she was involved with conservation engineering."

155.    Hernandez expresses that Baucage had no record of involvement with conservation programs, no experience managing an emergency watershed program in the aftermath of a hurricane, and no background to make recommendations on research in erosion control, irrigation, or drainage.

156.    Hernandez has said Baucage had no experience with the NRCS watershed management program.

157.    Hernandez states that he never asked how Baucage would go about formulating policies and procedures if she was selected despite her complete unfamiliarity with conservation engineering.

158.    Baucage has admitted her own lack of qualification; thus, Baucage says she she had no experience with floodwater protection, and had never worked on the National Watershed Programs at the time of her selection.

159.    After reading from her own brief resume that Baucage could not meet the critical element of one year's experience to become State Conservation Engineer, Hernandez would have reasonably known that Human Resources

erred in sending him her resume as a qualified candidate, and had to suspect she had lied to the staffing specialist on (Response to Assessment Questions in Exhibit 17j Announcement at 3-7) her self-assessment to get qualified.

160.    At a minimum, Hernandez knew or should reasonably known after reading her brief resume that <u>Baucage could not meet the critical element of one year's experience to become State Conservation Engineer</u>.

161.     At that point, with his experience, he should have looked for another candidate—Newman, but he declined to do so due to Newman's age, sex and national origin.

162.    The NRCS-standard practice always followed in Puerto Rico was to conduct structured interviews.

163.    Hernandez ignored the formal SOP, the guidance of HR, the recommendations of Padron and Suarez, the wisdom of f Southeast Region Conservationist Tillman and of Human Resources, in not conducting structured interviews.

164.    The Defendant's selection process utilized here by Hernandez was not designed to select the best qualified applicant, but rather to select a younger, female, Puerto Rican candidate over Newman. The failure to hold structured interviews is a key deviation from which discrimination can easily be inferred.

165.    Thus, all Defendant witnesses at the EEOC concurred that no candidate other than Baucage was interviewed.

166.    Yet  Hernandez denies Baucage's statement that he conducted an hour-long interview with her.

167.    Padron was upset by Hernandez's failure to conduct interviews, noting they were mandatory under the SOP she had developed and to which Hernandez was bound.

168.    Hernandez's action in conducting no interviews was unprecedented in NRCS Puerto Rico.

**R.  Hernandez Created a Post-Hoc, Phony Criterion**

169.    Hernandez indicates that in addition to skills, his key criterion for selection was "remote supervision[,]" distinguishable from on-site.

170.    Hernandez states that "remote supervision" was not listed on (the vacancy announcement for the position in question.

171.    He  admits "remote supervision" was nowhere in Vacancy Announcement No. NRCS-19-10492203-DE-MM. Ex. 1 hereto—pdf at 29-43 of 68.

172.    Hernandez's discriminatory animus against an older non-Puerto Rican man and concomitant favoritism for a younger Puerto Rican woman who did not meet the basic qualifications for the position, caused this discriminatory selection.

## VII.    STATEMENT OF CLAIMS

**COUNT I:        DISCRIMINATION BY NON-SELECTION
ON ACCOUNT OF SEX, NATIONAL ORIGIN AND AGE
IN VIOLATION OF TITLE VII, THE ADEA
AND 29 C.F.R. §1614.101(b)**

173.    In this case, Newman demonstrates a prima facie discrimination case based on age, sex, and national origin which the Agency fails to rebut, creating a legally mandatory inference of discrimination.

174.    He is unquestionably a member of protected classes as an older non-Puerto Rican man, and Hernandez admitted he knew Newman's identities on those dimensions.

175.    Newman applied for the job, and Human Resources advanced his name to selecting official Hernandez because he was qualified. Newman also establishes—and it is undisputed-- that he was rejected for the position in favor of Baucage, a younger, Puerto Rican female.

176.    Newman has thus demonstrated with undisputed facts that he was a member of protected classes, that he was qualified and considered for the position, and not hired when the Agency passed him over, thereby establishing a prima facie case of discrimination that the Agency cannot rebut.

177.    When the prima facie case remains unrebutted by the Agency, there is a legally mandatory presumption of unlawful discrimination. *Littieri v. Equant, Inc.*, 478 F.3d 640, 648 (4th Cir. 2007).

178.    Hence, unless the Agency can produce a legitimate, non-discriminatory reason, judgment in *Newman's* favor is proper. See *Burdine*, 450 U.S. at 254 ("Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. . . . [I]f the

employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains . . .").

179.    The Agency must "articulate reasonably specific facts that explain how" it decided. See *EEOC v. Target Corp.*, 460 F.3d 946, 957–58 (7th Cir. 2006) (finding that Defendant failed to meet its burden on summary judgment where defendant failed to cite any evidence to support its alleged legitimate, non-discriminatory reason).

180.    Defendant's alleged "reason" must be supported by competent evidence. *USPS Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 (1983) (citing *Burdine*, 450 U.S. at 254).

181.    While subjective assessments can serve as legitimate non-discriminatory reasons for non-selection, "because [they] can be a pretext for discrimination, such 'reason[s] will satisfy the employer's burden of production . . . only if the employer articulates a clear and reasonably specific basis for its subjective assessment."

182.    Defendant herein has failed to provide a legitimate, non-discriminatory basis for eschewing Newman's selection.

183.    The Agency is required to "articulate reasonably specific facts that explain how" it decided. See *EEOC v. Target Corp.*, 460 F.3d 946, 957–58 (7th Cir. 2006) (finding that Defendant failed to meet its burden on summary judgment where defendant failed to cite any evidence to support its alleged legitimate, non-discriminatory reason).

184.    The Defendant's alleged "reason" must be supported by competent evidence. *USPS Bd. Of Governors v. Aikens*, 460 U.S. 711, 714 (1983) (citing *Burdine*, 450 U.S. at 254).

185.    While subjective assessments can serve as legitimate non-discriminatory reasons for non-selection, "because [they] can be a pretext for discrimination, such 'reason[s] will satisfy the employer's burden of production . . . only if the employer articulates a clear and reasonably specific basis for its subjective assessment."

186.    An employer which fabricates a false explanation has something to hide, perhaps retaliatory or discriminatory intent. *Aka v. Washington Hospital Center*, 156 F.3d 1284, 1295 (D.C. Cir. 1998) (en banc); *Cones v. Shalala*, 199 F.3d 512, 519 (D.C. Cir. 2000). Dishonesty about a material fact may be for the purpose of concealment and therefore "affirmative evidence of guilt." *Reeves v. Sanderson*, 530 U.S. 133 (2000).

187.    Defendant is unable in this case to meet the applicable minimal evidentiary standards.

188.    Thus, Defendant failed to provide a legitimate, non-discriminatory reason.

189.    Defendant's attempts to explain the non-selection, are blatantly pretextual.

190.    Defendant's explanations are cover-up of age, national origin and sex discrimination.

191.    Accordingly, by its non-selection of Newman, Defendant has

violated Title VII and the ADEA.

## VIII.   REQUEST FOR RELIEF

WHEREFORE, the Plaintiff, James Newman, prays that the Court grant

him the following relief:

a. Reinstatement to a position at the GS-13 level, with full back pay and benefits;

b. Compensatory damages, in an amount to be determined by the jury in accordance with the proof at trial, for the emotional, financial and consequential harm caused by Defendant;

c. Prejudgment and post judgment interest;

d. Reasonable attorneys' fees, expenses and costs;

e. Reimbursement for all expenses incurred related to the case;

f. Posting of notices on Defendants' premises notifying employees that Defendant has violated the anti-discrimination laws, and that employees who report future violations may not be subject to retaliation, and any other equitable relief needed to preclude the Agency from committing similar violations in the future; and

g. Such other relief as the court shall deem just and proper.

## IX.    JURY TRIAL DEMAND

The Plaintiff demands that this case be tried by a jury.

/s/ Manuel Porro-Vizcarra

_____
Manuel Porro-Vizcarra
Manuel Porro-Vizcarra  Law Offices
382 Escorial Avenue
Caparra Heights, Puerto Rico 00920
Tel. 787-774-8200
Fax 787-774-8297
mpv@mpvlawpr.com

THE GOLDSMITH LAW FIRM, LLC

/s/ Leizer Z. Goldsmith, pro hac vice
application pending

_____

Leizer Z. Goldsmith
5335 Wisconsin Avenue, NW, Suite 440
Washington, D.C. 20015
Telephone: (202) 926-3535
Facsimile: (202) 318-0798
Email: lgoldsmith@goldsmithfirm.com


Counsel for Plaintiff James K. Newman